UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CRIMINAL ACTION NO. 1:23-CR-0005618-GNS

UNITED STATES OF AMERICA                                                                                        PLAINTIFF

VS.

DAVID MANION                                                                                               DEFENDANT

## **SENTENCING MEMORANDUM**

Defendant David Manion, by counsel, respectfully requests that the Court fashion a non-custodial sentence that allows him to stay under the close care of his team of ten doctors, all of whom treat a myriad of chronic, life-threatening medical conditions. The Court may be inclined to dismiss Mr. Manion's request out of hand given that he is a repeat offender and received a downward variance the first time around, as the United States points out in its sentencing memorandum. But, after carefully considering Mr. Manion's critical medical state, his round-the-clock need for medical care, and the substantial commitments his entire family has made to the federal government, Mr. Manion believes that the § 3553(a) factors support a non-custodial sentence here. Sending Mr. Manion to a custodial setting for any amount of time—even weekends—will undoubtedly cause a decline in his medical condition and may ultimately result in his death.

      **I.**      **Mr. Manion's Acceptance of Responsibility and Basis for Please Agreement.**

Mr. Manion came to learn of the federal government's investigation in 2021 when his daughter, LeAnn, was questioned by USDA investigators. Mr. Manion immediately retained counsel and learned that he, his wife, his two daughters, their husbands, and a brother of one of the sons-in-law were being investigated for participating in a scheme to commit crop insurance

fraud. More particularly, at least as the government initially believed, Mr. Manion was using each of his family members as straw farmers to circumvent his five-year bar from the federal crop insurance program. With the government early in its investigation, and before it expended significant law enforcement resources, Mr. Manion expressed a willingness to accept responsibility for crimes that he or his family may have committed.

Through counsel, Mr. Manion and the government carefully negotiated the terms of a plea agreement for the better part of two years. The negotiations took time because, as the government acknowledges in its sentencing memorandum, the parties closely considered each of the Manions' conduct to assess whether they were indeed acting as Mr. Manion's straw farmers or acting independently. Evidence demonstrated that certain children were farming; getting up early, working the thousands of acres of fields owned by the Manions, harvesting tobacco, and taking tobacco to market. For that reason, Mr. Manion and the government acknowledged early on that it would not be a fair assessment of the evidence to merely lump all of the indemnity claims together as relevant conduct, count each of the children as co-conspirators, and let the guideline calculations fall as they may.

Instead, Mr. Manion and the government attempted to craft a settlement agreement that (1) fairly assessed the truly criminal conduct, (2) ensured the federal government was otherwise repaid for all indemnity claims submitted by the Manion family since 2016, totaling just under $9 million, (3) barred the entire Manion family from participating in the federal crop insurance program for seven years to ensure that these crimes would not be committed again, and (4) kept Mr. Manion's other family members, excluding LeAnn, from being prosecuted.

Mr. Manion and the government reached an agreement that satisfied each of those goals. Recognizing that the Court need only make a "reasonable estimate of the loss" for purposes of

sentencing, the parties agreed to a loss amount of $3.5 million—very much cognizant of the fact that it was the upper limit of the eighteen-point enhancement under § 2B1.1(b)(1). The parties also agreed that the two-point role enhancement under § 3B1.1(c) was appropriate because Mr. Manion indeed served in a supervisory capacity. In doing so, the parties negotiated away the four-point enhancement under § 3B1.1(a) because the evidence did not establish that there were "five or more participants," but instead that, at a minimum, the sons-in-laws were legitimately farming, reducing the total number of participants to three. Finally, the parties agreed not to include a sophisticated means enhancement under § 2B1.1(b)(10) because there is nothing sophisticated about a debarred farmer putting the family farm ostensibly in his children's name in order to collect federal crop insurance payments.

The parties also agreed that Mr. Manion would repay the government the total of $8,998,023 at or prior to sentencing, which was split between a restitution amount of $3.5 million and payment to satisfy other claims making up the difference. As one might expect for this amount of money`, the Manions have mortgaged nearly all of their valuable farmland to come up with the money to repay the government, which will be repaid before sentencing. As part of the negotiating process, the Manions wanted to make things right with the government and otherwise spare the government the pains of proving a restitution figure and collecting assets to satisfy that amount.

The Manions and the government compromised on potential charges that could have been levied against the other family members. In exchange for an agreement that the government would not prosecute the other family members—excluding LeAnn—the other family members accepted a seven-year ban from the federal crop insurance program. Mr. Manion accepted a lifetime ban. Together, these bans gave the government assurances that the Manion family could not participate in the federal crop insurance program for the foreseeable future.

**B.     Objections to the Presentence Report**.

Despite the parties' good-faith efforts to calculate appropriate sentencing guidelines, the Presentence Report imposes six additional offense levels through various inappropriate enhancements. Those enhancements nearly double the recommended guideline range, moving the low-end guideline recommendations from 41 to 78 months. To the government's credit, it has already submitted a sentencing memorandum disagreeing with the Presentence Report's calculation and otherwise standing behind the recommendations in the plea agreement. Mr. Manion concurs with each of the government's explanations as to why the six additional points through three different enhancements should not apply.

Mr. Manion explained in the previous section why enhancements under U.S.S.G §2B1.1(b)(1)(I) for loss of more than $1.5 million and §3B1.1(c) are appropriate, and those recommended by the PSR are not. He also provided extensive objections to U.S. Probation. (DN 18-1). Those arguments will not be repeated.

The two-point sophisticated means enhancement pursuant to U.S.S.G § 2B1.1(b)(10) deserves additional attention. The application note defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." It goes on to state that "hiding assets or transactions" "through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."

There is absolutely nothing sophisticated about Mr. Manion's scheme. He owns thousands of acres of farmland. He had his children insure crops on that land in their names instead of his. The children submitted losses on tobacco crops and received insurance checks from the federal government. The children paid a portion of those payments to Mr. Manion via check and he

4

deposited that money into his bank account. With the remaining portions of the money, the children paid for living expenses, equipment, and farming supplies. They also bought farmland and titled it in their own name.

The Presentence Report on this point reads more like advocacy than objective findings. It states that Mr. Manion "orchestrated and executed a multijurisdictional fraud" and "availed himself of the property laws of different state jurisdictions." Setting those extreme conclusions aside, the fact of the matter is that Mr. Manion lives in Lafeyette, Tennessee, just miles over the Tennessee-Kentucky line. He owns farmland in both Tennessee and Kentucky that straddle the state line. The Presentence Report makes it out that Mr. Manion is hiding assets across the United States when, in actuality, his entire operation is contained within a radius of probably 50 miles. The property his children purchased was titled in their own names with deeds registered in local courthouses. Neither Mr. Manion nor his children undertook any effort whatsoever to hide assets, much less place them in fictitious entities, offshore accounts, or sophisticated corporate structures. The PSR's conclusion that Mr. Manion "availed himself of the property laws of different state jurisdictions" sounds serious but offers no explanation about why this matters or what it does to establish sophisticated means. Simply put, Mr. Manion's scheme was ham-handed, simple, and in plain sight.

Mr. Manion submits that the parties' plea agreement accurately reflects the offense level, which is 22 after giving credit for acceptance of responsibility. With a criminal history category of I, Mr. Manion's recommended guideline sentence should be 41 to 51 months.

  C. **The § 3553(a) factors.**

  1. **The History and Characteristics of Mr. Manion.**

    a. **Mr. Manion's significant chronic medical conditions.**

5

The Presentence Report generally summarizes Mr. Manion's significant medical conditions, most of which stem from poorly controlled diabetes Mellitus.  With even that brief summary, the Presentence Report indicates that Mr. Manion's physical conditions are significant enough to warrant a departure pursuant to USSG § 5H1.4 or, at a minimum, a variance pursuant to 18 U.S.C. § 3553(a).  Both a departure and a variance are warranted here, particularly when the totality of Mr. Manion's condition is considered.

Mr. Manion's primary physician, Hanna Ilia, MD, provides a general overview of Mr. Manion's conditions.  He indicates that:

> David suffers from multiple health conditions, including but not limited to Diabetes Mellitus with complications, Heart Disease, Obstructive Sleep Apnea, Obesity, Mixed Hyperlipidemia, Essential Hypertension, Vitamin D Deficiency, Insomnia, Osteoarthritis of Knees, Lower Urinary Tract Symptoms due to Benign Prostatic Hypertrophy Testicular Hypofunction, Peripheral Venous Insufficiency, and Chronic Maxillary Sinusitis.

Ex. 1, Ilia Report.  He lists 24 medications that Mr. Manion takes on a regular basis, many of which he takes by injection on a daily basis.  *Id.*  Here is a picture of his current medications.



According to Dr. Ilia, Mr. Manion's "medical conditions pose significant health risks and require regular medical attention, monitoring, and specialized care." *Id.*  He warns that "[i]f one dose of medication is missed, it could be very detrimental to health" and that "[g]iven the complex health challenges faced by David, a prison sentence could exacerbate these conditions and lead to serious consequences, including a risk to his life." *Id.*  He ultimately opines "in my medical and professional opinion that alternative sentencing options or medical parole may be more appropriate when considering the potential harm a prison sentence could impose on David's well-being."

Mr. Manion's endocrinologist, Dara Botts, offers further information about his unstable diabetic condition.  She explains that Mr. Manion has "Type 2 diabetes uncontrolled with autonomic neuropathy bilateral lower extremities." Ex. 2, Botts Report.  His condition requires careful meal planning and "large doses of insulin with leans and bedtime in attempts to lower his blood glucose which is extremely elevated at this time." *Id.*  In addition to having no feeling in his lower extremities, Mr. Manion's elevated blood sugar causes "recurring ulcers on his feet and lower extremities." *Id.*  His diabetes also causes retinal hemorrhages requiring injections into his eyeball, all leading to worsening eyesight. *Id.*  His diabetes has also impacted his kidneys and memory function.

Botts also explains the challenges of managing Mr. Manion's diabetes.  She indicates that Mr. Manion is prescribed a Continuous Glucose Monitoring System that monitors his blood sugar throughout the day in order to make real-time adjustments to his meals and insulin injections administered three times per day. *Id.*  She warns that Mr. Manion's "comorbid conditions of hypertension, hyperlipidemia, and sleep apnea make managing his blood glucose a high priority to slow the long-term complications he is now experiencing with his nerves, eyes, kidneys, and

heart." *Id.* She concludes by cautioning that Mr. Manion's "uncontrolled diabetes is very concerning, and it requires vigilant monitoring and adjustments in his care." *Id.*

Dr. David Reichstein of Tennessee Retina elaborates on the impact that Mr. Manion's diabetes has had on his eyesight. According to Dr. Reichstein, Mr. Manion has been diagnosed with "severe nonproliferative diabetic retinopathy of both eyes and diabetic macular edema of the right eye." Ex. 3. These conditions reduce Mr. Manion's vision, blur his vision, and "affect everyday activities." They "require continuous treatment and timely evaluations to prevent *permanent vision loss,*" which includes injections into his eye every 4-5 weeks. *Id.*

On March 5, 2024, Mr. Manion was diagnosed with stage 2 chronic kidney disease. Ex. 4, March 5, 2024 note with Dr. Priyadarshi. Mr. Manion reports that he returned to his nephrologist on May 23, 2024, and has now been diagnosed with stage 3 chronic kidney disease.

Mr. Manion's diabetes is also wreaking havoc on his lower extremities. He can't feel his legs. He can't feel his feet. When ulcers and open wounds develop on the bottoms of his feet, he doesn't know they are there because he can't feel them or see them. Mr. Manion's podiatrist reports a history of ulcers and open wounds dating back to May 31, 2016. Ex. 5, Dr. Frazier Report. According to Dr. Frazer, Mr. Manion developed an ulcer around the big toe on his left foot in 2020. *Id.* "Due to problems with his blood sugar control, continue neuropathy, the wound continued to stay present, and some weeks could get better another week's get worse" which continued for three years until May 24, 2023, when Mr. Manion was hospitalized for debridement of the wound and bone removal, until Mr. Manion ultimately underwent a toe amputation in July 2023. *Id.*

Dr. Frazer explains that "Mr. Manion is difficult to control, brittle diabetic male who has consistently had multiple problems with his feet secondary to neuropathy including consistent

8

neuropathic pain, recurrence of ulcerations, new locations of ulcerations." *Id.* Despite extensive efforts to limit the ulcers, Dr. Frazer reports that Mr. Manion "still has significant problems with his feet."

And Dr. Frazer speaks from personal experience with other inmates about the risks Mr. Manion will face if he is imprisoned. Dr. Frazer writes, "I have just recently in the past 4 weeks had performed a transmetatarsal amputation on an inmate here in Sumner County due to foot infection that presumably occurred while he was in the jail, and that patient was released on ROR due to healing requiring IV antibiotics post procedure and consistent with postoperative care". *Id.* Unlike Mr. Manion, this was "a patient who had no previous problems with his feet prior to incarceration" yet the condition arose within six months of being incarcerated. *Id.* Dr. Fraser warns, "this is my significant concern with Mr. David Manion being incarcerated." "Due to his multiple comorbidities, aside from his diabetes, he is at significant risk of complications arising, even in best practices, due to his severe comorbidities." *Id.*

Just this week, Mr. Manion developed another open wound on the bottom of his right foot. Lisa discovered the wound as she was drying him off after a bath. This open wound presents serious risks of infection and further amputation. Here is a picture of the new wound.



In December 2023, Mr. Manion was diagnosed with memory loss related to his uncontrolled diabetes. Ex. 6, Dec. 12, 2023 visit with Dr. Mason. Records indicate that Mr. Manion has "short term memory loss, *trouble remembering if he took his meds*, if he ate dinner." *Id.*

Mr. Manion suffers from other significant medical conditions that are not directly related to his diabetes. Dr. William Faith reports that Mr. Manion has severe obstructive sleep apnea with associated severe hypoxemia. Ex. 7, Dr. Faith Report. Dr. Faith indicates that Mr. Manion must sleep with a CPAP and "failure to do so risks causing a stroke and or heart attack." *Id.*

Mr. Manion's cardiologist, Rick Koch, has diagnosed him with heart arrhythmia, hypertension, coronary artery disease, and lipid disorder. Ex. 8, Dr. Koch July 11, 2023 note.

Mr. Manion also has a range of orthopedic issues to include a torn left rotator cuff, lumbar stenosis and spondylosis, and bilateral knee osteoarthritis. Ex. 9, Jan. 11, 2022 Tenn. Ortho. Note. According to his orthopedist, Mr. Manion's "progress is definitely hampered by his diabetes and peripheral neuropathy" and "he is less than ideal surgical candidate given his severe diabetes and poor rehabilitation potential." *Id.*

Mr. Manion's wife, Lisa, provides a snapshot of her own life providing round-the-clock care to Mr. Manion. She writes that she has been married to Mr. Manion for 38 years. Ex. 10, Lisa Manion Letter. She and Mr. Manion have raised two daughters together and now have five grandchildren between the ages of 9 weeks and five years old.

In the mornings, Lisa helps Mr. Manion out of bed, and helps him put on his underwear, shorts, socks and slip-on shoes because he cannot bend over. *Id.* She gives him his morning medications and injections, and then helps him get seated in front of the TV or on the porch, where he spends his morning. She goes about her morning tending to the house but keeping a close eye

on Mr. Manion's glucose monitor which is tied to her iPhone. If Mr. Manion's sugar drops, she gets an alert on her phone. Lisa offers Mr. Manion lunch mid-day, and then helps him return to the couch where he spends his afternoons. In the evenings, Lisa helps Mr. Manion into a warm bath so that he can get relief from the pain in his legs and feet. She hands him his soap and shampoo. She has to help him out of the tub because he is a fall risk and dry off his lower half because he cannot do it himself. She helps him to bed and ensures he puts on his CPAP machine, which is somewhat of an improvement from the 24/7 oxygen he had previously been on.

Lisa fears that if anything happened to her, Mr. Manion would have to go to a nursing home for care. She writes that she provides him care around the clock, that he is homebound, and that he needs her help with "all activities of daily living, from getting dressed to bathing, from eating to sleeping."

### b. Mr. Manion is a good husband, father, and member of the community.

In addition to the letter from Lisa Manion, six other well-regarded members of Mr. Manion's community have provided letters speaking to his character. Macon County Sheriff Joey Wilburn writes that Mr. Manion "has been a great help to our county in a desperate time of need" by selling a 100-acre farm to the Macon County School System substantially below market value in order to build new schools. Ex. 11, Wilburn letter. Sheriff Wilburn reports that Mr. Manion and his family "are considered pillars in our farming community" and that Mr. Manion "is a good family man who works hard to provide for his family."

Chris Crowder, a local preacher, writes that he has known Mr. Manion for over twenty years. Preacher Crowder describes Mr. Manion as "a father of two beautiful children and a devoted husband" who "has always been a very honest, hardworking and God-fearing man." Ex. 12,

Crowder letter. Preacher Crowder observes that Mr. Manion attends church regularly, and that his daughters are very active in the church—which he deems a testament to Mr. Manion.

Ray Comer, Senior Vice President of Citizens Bank, writes that he has known Mr. Manion for 28 years and has regularly called on Mr. Manion for farming advice. Mr. Comer reports that he has personally served the Manion family as their banker since 2019, and that "their relationship with the bank is held in high regard as a long-time partnership that has always been open, honest, and has always performed as agreed." Ex. 13.

As these letters and the others enclosed collectively as Ex. 14 demonstrate, Mr. Manion is an understated family man that serves his community. Mr. Manion is undoubtedly the head of his household. His two daughters bring the five grandchildren to Mr. Manion's house every morning, where the daughters, grandchildren, Lisa and Mr. Manion spend their day. The sons-in-laws come and go from Mr. Manion's house throughout the day as they are passing between jobs on the farm. The entire family sits down together every night at the family dining table, where Lisa serves her finest country cooking—though Mr. Manion is not able to enjoy that as much as he once did because of his diabetes. As much as Mr. Manion depends on Lisa for continual care, the entire family depends on Mr. Manion as their patriarch.

### 2. Promote Respect for the Law, Provide Just Punishment and Afford Adequate Deterrence.

The local farming community has already taken serious note of the plea agreement that Mr. Manion has entered. The community has taken most interest in the fact that Mr. Manion is paying back nearly $9 million, and his entire family will be without federal crop insurance for the foreseeable future. The community has learned that the Manions have mortgaged nearly all of their valuable farmland to repay the government. Farmers understand that the Manions now stand to potentially lose everything they have amassed over many generations if they have one bad crop

12

year that would have been otherwise covered by insurance.  Without insurance, if they have a bad crop, they will be without the income they depend on at the end of the growing season to pay off the line-of-credit that gets them through the winters and the growing season.  And, if they have a failed crop and no insurance, they will be unable to repay the bank on the loan they have taken out to repay the government, which may result in a substantial foreclose action.

Farmers also understand that loans of this size come with significant interest obligations. Mr. Manion is accruing interest at 7.75% annually, which equates to $542,500 per year or $1,500 per day.   In other words, while he may be repaying the government just south of $9 million, he and his family will ultimately pay substantially more money back to the bank.  That is a significant financial obligation that will undoubtedly remind Mr. Manion every time he writes a mortgage payment of his criminal conduct.   All told, the substantial payment back to the government, the bar from the federal insurance program, the even more substantial debt obligation, and the risk of losing everything serve as more than adequate punishment to Mr. Manion and as a deterrent to the local community.

     **3.**     **Protect the Public from Further Crimes of the Defendant.**

The parties contemplated a punishment that directly serves this end by agreeing that Mr. Manion will be barred from the federal crop insurance program for the rest of his life, and his family will be barred for seven years.

     **4.**     **Provide the Defendant with Needed Vocational or Educational Training, or Medical Care.**

A non-custodial sentence is the only way to accommodate Mr. Manion's medical condition adequately.  Mr. Manion requires continuous monitoring to ensure that he takes the appropriate medicine, his blood sugar does not quickly spike or plummet, he does not fall, and he does not

forget whether he took his medicine. Mr. Manion's feet have to be watched regularly to ensure an ulcer does not open up. He cannot feel his feet or otherwise see them, so he has no idea when his feet have an open wound ripe for infection. That risk, coupled with the sanitary conditions of a prison environment, pose a tremendous risk of Mr. Manion suffering an infection that results in more amputations or death.

### D.     Conclusion.

Mr. Manion is too sick to send to prison. He is too sick to serve weekends in a county jail that is ill-equipped to care for serious medical conditions. His condition is so fragile that even a couple days away from regular monitoring and medication could result in a rapid decline, serious health issues, and ultimately death.

Mr. Manion's health does not give him a free pass. Mr. Manion has otherwise agreed to accept significant consequences for his actions that will have long-lasting effects on him and his family. Taking out a loan to repay $9 million may ultimately result in the Manions losing everything they have ever earned. That is the risk they have taken on to make things right with the government.

For each of these reasons, Mr. Manion respectfully requests that the Court fashion a non-custodial sentence.

This May 24, 2024.

> KERRICK BACHERT PSC
> 1025 State Street
> Bowling Green, KY 42101
> T: (270) 782-8160
> F: (270) 782-5856
> kbumgarner@kerricklaw.com
>
> */s/ Kyle G. Bumgarner*
> Kyle G. Bumgarner
> *Counsel for Defendant Manion*

**CERTIFICATE OF SERVICE**

      I hereby certify that on this May 24, 2024, the foregoing was electronically filed with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filling to counsel of record.

<u>/s/ Kyle G. Bumgarner</u>
Kyle G. Bumgarner
*Counsel for Defendant Manion*
